## Eisenhart's Estate

*William S. Eisenhart, Jr.,* for appellant.

*Robert M. Laird,* for Commonwealth.

GROSS, P. J., March 2, 1950.—This is an appeal from the transfer inheritance tax appraisement in the estate of Raymond H. Eisenhart, late of the City of York, who died January 9, 1948, owning two recorded mortgages as follows:

No. 1, a mortgage given by Eisenhart's Dairy, Inc., to decedent, dated November 24, 1947, in the principal sum of $34,000, with an accompanying bond in the penal sum of $68,000. This mortgage is a first lien on all of the real estate owned by the corporation, consisting of two adjoining tracts of land in the City of York. . . .

This mortgage bears interest at the rate of four percent per annum and provides for its amortization by weekly payments, including principal and interest, at the rate of $104.

On January 9, 1948, the unpaid principal of the mortgage was $32,598.52, with interest accrued to that date of $386.32, or a total sum of $32,975.84, at which

amount the mortgage was appraised for Pennsylvania transfer inheritance tax.

No. 2, a chattel mortgage, given by Eisenhart's Dairy, Inc., to decedent, dated November 24, 1947, in the principal sum of $60,000, with accompanying bond in like amount, with interest thereon at the rate of four percent per annum, from date, payable in weekly installments for a period of seven years and four months from date, and thereafter principal and interest to be paid in weekly installments of $150 until principal and interest are paid in full. The mortgagor, however, has the privilege of paying the principal and interest in full at an earlier date. The interest is to be determined on a monthly basis.

By its terms, the mortgage covered:

"All of the following goods and chattels located on or about the plant of Eisenhart's Dairy, Inc., or used in connection therewith; inventory and supplies on hand; milk and ice cream processing equipment and machinery, including cabinets located at establishments of customers; dairy store equipment, including soda fountains, cabinets and counters; office furniture and equipment; (4) motor trucks and equipment; lighting fixtures and wiring; oil burner, boiler tank and extra radiators."

There is no provision in this chattel mortgage that the machinery and equipment included in it will be maintained in its present condition or at any minimum value either by maintenance or replacement.

On January 9, 1948, the unpaid amount of principal of the mortgage was $60,000, and the interest accrued to that date was the sum of $860, or a total sum of $60,860, at which amount the same was appraised for Pennsylvania transfer inheritance tax.

In the general inventory and appraisement made by two impartial appraisers filed in the office of the register of wills by the executors, the principal of the real

estate mortgage was appraised at $25,000 and the interest due thereon at $386.32, and the principal of the chattel mortgage was appraised at $15,000, and the interest due thereon at $860.

Annie R. Eisenhart and York Trust Company, executors and trustees of the estate of Raymond H. Eisenhart, have appealed from the appraisements of the Commonwealth on the grounds that the appraisements are in excess of the values of the mortgages and accompanying bonds as of January 9, 1948, the date of decedent's death.

From the uncontradicted evidence of Clair E. Eisenhart, son of decedent and secretary-treasurer of the Eisenhart's Dairy, Inc., called by the Commonwealth as under cross-examination, and whose testimony will be referred to later, it appears that the background of these two mortgages is as follows:

For a number of years prior to 1947, Raymond H. Eisenhart, decedent, had operated, as sole proprietor, a retail milk business, which, in 1943, was converted into a wholesale milk products and retail ice cream business with cafeteria. In connection with this business, he also acted as broker of milk and ice cream.

Sometime after July 1947 decedent decided to incorporate his business, with the object in view of turning it over to his two sons, Clair E. Eisenhart and Lester L. Eisenhart, who had been in his employ and assisted him for a number of years in the operation of his business.

The corporation was organized under the laws of the Commonwealth of Pennsylvania, with an authorized capital of $5,000, divided into 1,000 shares of common stock of the par value of $5. No cash was paid into the corporation. The sons, individually, seem to have paid the cost of incorporation, amounting to $500. There was issued to decedent two shares of the stock to qualify him as a director and he became the presi-

dent of the corporation. These two shares of stock were appraised for transfer inheritance tax at $1 per share.

In consideration of past services rendered to their father and without paying any cash therefor, there was issued to each of the two sons 449 shares of stock. The son, Clair E. Eisenhart, was made secretary and treasurer of the corporation. The father and the two sons constituted the board of directors. They owned all of the stock and were therefore the owners of the corporation.

On or about November 4, 1947, at a meeting, of which no minutes were made, of the stockholders or directors (it is immaterial which it was because all three were present, attended by legal counsel and an accountant), decedent, pursuant to a former understanding with his sons, proposed to sell and transfer all of the assets of the business, of which he was sole proprietor, except cash and accounts receivable, of which there apparently were none, to the corporation at their original cost to him, to wit, the sum of $94,000, and also agreed to accept in payment of these assets the two mortgages aforesaid. Decedent's proposition was unanimously accepted by the three stockholders and directors, pursuant to which, and without the payment of any cash whatsoever to decedent, the aforesaid two mortgages were executed and delivered by the corporation to decedent on November 24, 1947.

The procedure in appeals from valuations for inheritance tax purposes is analogous to, and the same rules apply as in appeals from, the action of county commissioners sitting as a board of revision.

The taxing authorities make out a prima facie case by the introduction in evidence of the appraisement made by the inheritance tax appraiser, as was done in this case, and the burden of showing an excessive ap-

praisement rests upon those who claim it to be excessive: Clabby's Estate, 308 Pa. 287, and Webster's Estate, 314 Pa. 233. . .

The Act of June 20, 1919, P. L. 521, 72 PS §2301, as amended, imposes an inheritance tax "upon the clear value of the property subject to the tax", based upon "a fair and conscionable appraisement" thereof, as of the date of decedent's death. The clear value of the property is a matter of fact and as the trial, on appeal, is de novo, the court has power to reduce or increase the appraisement in accordance with the weight of the evidence: McLure Appeal, 347 Pa. 481.

The terms "clear value" and "market value" in this case mean the same thing but neither of them are synonymous with "intrinsic value". The "intrinsic value" of these mortgages may have been relatively great in the hands of decedent, but in the last analysis, they were worth to their owner just what he could have gotten for them had he wanted to sell them, and it is this value at which they should be appraised as an asset of his estate for transfer inheritance tax.

The Eisenhart's Dairy, Inc., the mortgagor, is what is known as a close corporation, having a capital of only $5,000, owned exclusively by three stockholders, all in the same family, and certificates of indebtedness, irrespective of their form, issued by it, would not be quoted in the markets and therefore would not attract the notice of investors.

Polisher, author of Estate Planning and Tax Saving, in 48 Dickinson Law Review 126, basing his authority upon McLure Appeal, supra, and Wood's Estate, 29 Dist. R. 960, lays down the rule that, where decedent's business consists of unlisted, inactive and closely held stock having no ready market, its value is established by proving the value of the property, less its liabilities. But this rule has very little, if any, application to the values of these two mortgages, because they are the

first liens on the property described in them. It is, therefore, obvious, as pointed out in Gerber's Estate, 43 Lanc. 433, that the present market value of the real estate and personal property covered by the mortgages must be taken into consideration as basic factors to be considered in fixing the clear value of the same. See also Kyle Estate, 6 Somerset 319, and Kingland's Estate, 193 N. Y. Supp. 638.

There are, of course, other considerations to be taken into account, such as the bonds accompanying the mortgages, because of the possibility of reaching other assets not included in the mortgages: Miller's Estate, 54 York 133. The attending terms of maturity, liquidation and eventual recovery, the assurance of income meanwhile, obsolescence, depreciation, costs of replacements and repairs are all relevant inquires on value: Webster's Estate, 314 Pa. 233, 236; Nolan's Estate, 31 Berks 298; Barbey's Estate, 34 Berks 155.

In Appeal of Pennsylvania Co. for Insurances on Lives and Granting Annuities, 282 Pa. 69, 74, the Supreme Court states the rule, which we think should be followed in the valuation of these mortgages, as follows:

"By fair market value is meant the amount of money which a purchaser willing but not obliged to buy the property would pay to an owner willing but not obliged to sell it, taking into consideration all uses to which the property is adapted and might in reason be applied": 26 R. C. L. 365.

It is the price which the property to be appraised would bring at a fair sale between the parties dealing on equal terms and, in order to give proper consideration to all the factors and elements affecting the price, the evidence may take a wide range: Wood's Estate, supra.

Keeping in mind the history of these mortgages and the foregoing principles of law, let us consider the evidence.

The Commonwealth submitted no oral testimony other than that brought out on cross-examination. Appellant employed the American Appraisal Company, Inc., with offices in the City of Philadelphia, Pa., for the purpose of making an appraisal of these mortgages. They also called George D. Deardorff, a local realtor, for his opinion. The writer of this opinion, since the taking of the testimony, following a practice which was approved in Felin v. Philadelphia, 354 Pa. 317, 320, and DeStefano v. Meglio et ux., 64 D. & C. 599, 601, (Bok, J.), personally inspected the premises of Eisenhart's Dairy, Inc., going through every part thereof and viewing all of the machinery and equipment found therein.

James W. Cunningham, the representative of the American Appraisal Company, Inc., was called as a witness and, briefly summarized, he testified that he resides in the City of Philadelphia and has been employed by the American Appraisal Company, whose business is the valuation and appraisal of all types of property, both physical and tangible—in general any type of property which has value; that he has been employed by his company for 33 years, starting as a field engineer, spending time in the office of the company and in the field; that he has had charge of appraisal work in this area and is now district manager of the Philadelphia office of his company and has charge of all appraisement work done in Eastern Pennsylvania.

In 1945 the witness was loaned by his company to the Foreign Liquidation Commissioner of the United States Government and acted as his valuation assistant in the Philippines and China for eight months. In 1941-42 he supervised for his company and had charge of making appraisals of five dairies in York (one of them being this very dairy in the hands of its predecessor owner in 1941), five in Harrisburg, four in Reading and four or five in Schuylkill County, for presentation

before the Milk Commissioner of Pennsylvania. He also had charge of various appraisals of real estate in the vicinity of York.

In May 1949 the American Appraisal Company, under the witness' supervision and at the request of the executors and trustees of the Raymond H. Eisenhart Estate, made an appraisal of the two mortgages held by decedent for the purpose of determining their fair market value as of January 9, 1948, the day of decedent's death. In the making of this appraisement he was assisted by two other employes of his company, B. J. Diggery and Cliff Dorman. The report of appraisal was made in writing, offered in evidence, and is appellants' exhibit no. 1. These three men, representing the appraisal company, made an inspection of the properties mortgaged, the land and the buildings and the machinery and all equipment therein covered by the chattel mortgage; they inspected copies of the mortgages and studied statements of the dairy company's earnings. They compared the face value of the chattel mortgage with respect to the security and principal, rate of interest payable and the value of assets securing both mortgages. They consulted with the dairy company and its accountants, getting information with respect to the history of the business and the history of the earnings available for the servicing of the mortgages. Their investigation showed, from the records of the dairy company, that for the six months' period prior to January 9, 1948, the company operated at a small loss; that the business over the period of five years prior to decedent's death and while he operated the same individually, showed an annual loss in round figures of $2,500, and that it would require the sum of $5,400 annually to service the real estate mortgage and to service both mortgages the annual sum of $7,-800, according to the terms thereof. This history in-

dicated that the dairy company will not have available earnings to properly service either mortgage.

The witness explained that the instant real estate is unique, not comparable to any other in the neighborhood because of the special features of the real estate, its machinery and equipment and the consequent cost to convert and adapt it to uses other than that of a lunch room, dairy store and ice cream factory, to which use it is now being put.

Records of sales of other property in the vicinity were obtained by this witness's assistants to facilitate the appraisal project and, on the basis of such records, plus his own personal investigation at the situs of the land, he reached a conclusion on the value of the real estate. He arrived at a fair market value on the real estate mortgage, giving consideration to the liquidation value of the property which secured the mortgage, the rate of interest specified by the mortgage as compared to interest rates of similar mortgages, the term of years specified and their amortization, the management and type of business of the mortgagor, the history of the earnings of the mortgagor and of the predecessor owner and the possibility of payments of interest and principal as specified in the mortgage. He places the liquidation value of the underlying real estate of the real estate mortgage, as of January 9, 1948, at $16,000 and, giving consideration to the other factors, places the fair market value of the mortgage, as of that date, at $22,000.

As to the chattel mortgage Mr. Cunningham testified that the basic forced sale value of the underlying assets of the chattel mortgage, which immediate sale at date of death would probably have produced, were fixed at the then immediately realizable value of $3,800 for materials and supplies and $13,600 for the second hand machinery and equipment, the underlying property of the chattel mortgage being of the type which depre-

ciates considerably and, in the case of some supplies, practically completely.

Further, Mr. Cunningham testified that, since there is no provision that the machinery and equipment, included in the mortgage, will be maintained in its present condition, either by maintenance or replacement, and the nature of the equipment is such that it will continue to seriously deteriorate from natural wear and usage before the elapse of seven years, which, by the terms of the mortgage, is the time before which repayments are to be made on principal, and also since the materials and supplies which form the balance of the property subject to the mortgage are currently consumed in the operation of the business, so that as a result none of the usable materials and supplies which were on hand at date of death will be in existence at the end of seven years, the possible liquidation value promises to diminish the longer the mortgage runs. Applying the same considerations to the chattel mortgage as were applied to the real estate mortgage, the American Appraisal Company concludes that the machinery, equipment, materials and supplies have a liquidation value on January 9, 1948, of $17,400 and that the fair market value of the chattel mortgage is $20,000 on that date. The existence of the bonds accompanying the mortgages added no value, in the opinion of this witness.

Counsel for the Commonwealth moved to strike out the testimony of the witness, Cunningham, insofar as it relates to the evaluation of the real estate, for the reason that he had not qualified as an expert, having acquired his information from his assistants, who were not in court to testify and be subjected to cross-examination. We overruled this motion. The motion was renewed, and again overruled. The motion was again renewed, and again overruled. The same objection was made and persisted in at the argument which makes

it necessary for its further consideration. It will be observed that the objections to Mr. Cunningham's testimony are directed entirely to that relating to the value of the real estate covered by the real estate mortgage.

In testifying to the procedure followed in making the appraisal of the real estate, Mr. Cunningham said:

"I and two assistants of the company, Mr. B. J. Diggery and Mr. Cliff Dorman, made an inspection of the properties covered by the mortgage, the land, the buildings, the inventory" etc., and arrived at the value of the land and building "By comparison with selling prices of land in York, and our knowledge of what similar real estate sold for, or was being sold for at that date; that is like industrial buildings which could be used for like industry."

Under cross-examination the witness said he had no record of sales in York of that type of property; had no information as to what other people were asking for comparable types of property in York over the period of five to ten years prior to Mr. Eisenhart's death. Mr. Diggery made that investigation and the witness relied upon it after he, himself, had gone on the real estate and made a personal inspection and examination of it. Upon the information thus acquired, he based his evaluation and testified fully to the method he used in arriving at the value of the land and buildings.

An expert witness is one who, because of the possession of knowledge, not within ordinary reach, is especially qualified to speak upon the subject to which his attention is called: Struthers v. The Philadelphia & Delaware County Railroad Co., 174 Pa. 291. The admissibility of such testimony depends upon its necessity. Whenever the circumstances can be fully and adequately described to the jury and are such that their bearing on the issue can be estimated by all men without special knowledge or training, opinions of wit-

nesses, expert or other, are not admissible: Kuhn v. Ligonier Valley Railroad Company, 255 Pa. 445.

Who are competent witnesses to express opinions on the value of property is a question resting largely in the discretion of the trial judge whose ruling thereon will not be reversed by an appellate court except in case of clear error. Where the witness has even slight qualifications, permitting him to express an opinion will not be treated as error. The degree of the witness' knowledge may affect the weight of his evidence, but does not disqualify him if he appears to have some familiarity with the subject: Commonwealth v. De Martini, 125 Pa. Superior Ct. 392, 397; Davis, trustee, v. Southern Surety Co., 302 Pa. 21, 26.

While expert opinions may be based on facts which are admitted or appear in the evidence and cannot be predicated upon assumed facts, unsupported by evidence, they are not limited to assumed facts, hypothetically presented, outside the personal knowledge of the witness as their basis, but may be rendered solely on the basis of facts personally observed by him, or they may be based on personal observation combined with assumed facts appearing in evidence: Jackson et ux. v. United States Pipe Line Company, 325 Pa. 436, 440; Wigmore (3rd ed.) vol. II, sec. 678.

In Loeb v. Davidson et al., 261 Pa. 418, 422, the Supreme Court held that:

"While the usual practice is to receive the testimony of an expert in the form of answers to hypothetical questions which he, for the purpose of his testimony, assumes to be true, an expert frequently has occasion to personally examine the subject-matter of the inquiry, a familiar example being in the cases of physical ailments or injury, in which case he is permitted to testify to the result of his examination. Each expert offered by defendant made a personal examination of the building, together with plans and specifications, and an ob-

jection that they should not be permitted to testify as the result of such examination without the use of a hypothetical question, cannot be sustained: Wigmore on Ev., vol. I, Section 675; Greenleaf on Ev. (16th ed.) Section 441."

In Commonwealth v. Blankenstein, 81 Pa. Superior Ct. 340, 345, the court, discussing the competency of a witness, held as follows:

"The competency of the witness was a preliminary question to be decided by the court and we are unable to say that an error was committed in permitting the witness to testify. He appeared to have a wide knowledge on the subject, had made extensive inquiries, and had such information as enabled the court to hold that he was competent to testify. A qualified witness is permitted to state a relevant fact not generally known but known by him because of his training and experience and this is so although the witness may not be regarded as an expert whose opinion would be admissible on a hypothetical inquiry."

In Rieseck et al. v. Costa Bros., 103 Pa. Superior Ct. 51, 54, a witness had testified to the cost of replacing defective construction, and, after most of his evidence was in, it developed that he obtained the cost of steel for such purposes from others; plaintiffs then asked that his "testimony regarding cost be stricken from the record." In the circumstances, the appellate court held that the court properly refused the motion: Follansbee v. Garrett, 48 Pa. Superior Ct. 183, 187; Vile v. P. R. R., 246 Pa. 35, 38; Worden v. Connell, 196 Pa. 281, 286; Famour v. Thomas Yearsley Company, 80 Pa. Superior Ct. 58, 60.

Market value of land as defined in Pennsylvania Co. for Insurances on Lives and Granting Annuities, supra, may be shown by witnesses who have knowledge of the values of property similarly situated and available for like use, and opinions based on sales of such are

admissible to establish worth of the one in question. Testimony of this character is not limited to experts, but may be given by others not so qualified, who are familiar with the land involved and its surroundings.

If, however, there have been no recent sales of the lands under consideration or lands of like quality similarly situated, or no general asking or selling price in the neighborhood is shown, an appraiser must of necessity use his best judgment in determining what he believes the land would sell for at a bona fide sale after due notice. Thus the market value may be established by the testimony of persons acquainted with the property, and whose knowledge and experience qualify them to form an intelligent judgment as to its proper valuation: Pennsylvania Co. for Insurances on Lives and Granting Annuities, supra.

The standard of qualifications of witnesses called to establish worth must not be so high as to exclude the only available testimony: White v. Western Allegheny Railroad Company, 222 Pa. 534. It is sufficient if they have such reasonable knowledge of the value of land as could be expected in view of the circumstances of the particular case: Wissinger v. Valley Smokeless Coal Co., 271 Pa. 566; Lally v. Central Valley R. R. Co., 215, 436.

We conclude, in view of the foregoing principles of law relating to the competency of witnesses, and in view of the experience and knowledge acquired by the witness through many years of training and activity in holding appraisals, his personal investigation of the particular real estate and its improvements, showing it to be unique and not comparable to any other in the neighborhood, the uses to which it could be made available and the costs of doing so, qualified the witness to testify to its market value and that we made no error in refusing to strike out his testimony: O'Brien and Wright v. The Schenley Park & Highlands Railway

Co., 194 Pa. 336, and McSorley v. Avalon Borough School District, 291 Pa. 252.

The mere fact that the witness acquired some of his information, upon which he based his opinion, through his assistants, did not disqualify him: Rieseck v. Costa Bros., supra; Kamerer v. Commonwealth, 364 Pa. 120, 123; Chamberlayne's Hand Book on Evidence, sec. 744, p. 580.

Testimony of the American Appraisal Company was corroborated by that of George D. Deardorff, a local real estate agent of 25 years' experience in the buying and selling of realty in the City of York, familiar with the recent selling prices of real estate of commercial type in the vicinity of the instant real estate. As the result of personal investigation of the premises, he arrives at a saleable value for the underlying real estate, excluding the boiler which was covered by the chattel mortgage, as of January 9, 1948, of $18,500, on the basis of his information as to recent selling prices of real estate of commercial type in the vicinity, on the nature and condition of the improvements thereon, and on the possible other uses to which the instant realty and improvements could be put. Mr. Deardorff further testified that the usual rate of interest on a real estate mortgage loan in York depends upon the amount of the mortgage, the value of the security, and the more nearly the volume of money loaned equals the amount of the value of the securing property, the higher the rate of interest.

Clair E. Eisenhart, a son of decedent and secretary-treasurer of Eisenhart's Dairy, Inc., since its incorporation, was called by the Commonwealth as under cross-examination and testified that the corporation purchased the assets, real and personal, of his father's business, and paid for the same by giving the two mortgages totaling $94,000, but that he thought the assets were worth approximately $50,000 less than that

amount, but that his father, decedent and president of the corporation, thought they were worth $94,000 because it was a family affair and it would be giving his two sons an opportunity to go into business without any investment and that if they could not succeed, decedent agreed to make a downward adjustment. The witness thought the assets purchased, real and personal, were worth $35,000 to $40,000. They were set up on the books of the dairy company at their purchase price. In the capital stock reports of the dairy company made to the Commonwealth, the values used were those of a going concern and were comparable to the purchase price.

The company was unable to borrow money from banks for the conduct of the business and their mother advanced the company the sum of $15,000 for that purpose. After incorporation, the father received no salary, and the two boys each took, and are still getting a salary of $55 per week.

Giving full consideration to the competency and credibility of the witnesses and the proper weight to all the evidence submitted, we think that the presumptive correctness of the appraisement of these two mortgages made by the Commonwealth's appraiser has been overcome and that the appraisement is excessive.

We, therefore, enter the following

### Decree

And now, to wit, March 2, 1950, the appeal is sustained. The appraised value of the real estate mortgage is reduced from $32,975.84 to $25,500, and the chattel mortgage is reduced from $60,860 to $21,500, which values so determined we consider, under all the evidence in the case, to be the fair market value of the mortgages respectively.

The costs of the appeal we direct shall be paid by the estate of decedent.